OPINION
{¶ 1} This case arose after several shots were fired into a bar while a fight was in progress. The incident took place on January 25, 2004, in Ravenna, Ohio. Appellant, Wrahsaan J. Barringer ("Barringer"), was identified at trial as one of the shooters.
 {¶ 2} Barringer was indicted on six charges arising from this incident. The case was tried to a jury, and Barringer was found guilty on four of the six charges: felonious assault against Deborah Kelly, with a gun specification; felonious assault against Jonathan Caples, with a gun specification; having a weapon while under a disability; and illegal possession of a firearm in a liquor permit premises. He was found not guilty of felonious assault charges against Clemmie L. Perry and Rodney Mack.
 {¶ 3} The jury returned its verdict on July 8, 2004, and on July 21, 2004, Barringer filed a motion for a new trial. The trial court overruled the motion for new trial on August 9, 2004 and, on the same day, sentenced Barringer to two consecutive seven-year sentences on the felonious assault charges, both sentences to run consecutive to a mandatory three-year sentence for the two merged gun specifications. In addition, Barringer received two concurrent eleven-month sentences on the charges of having a weapon while under a disability and illegal possession of a firearm in a liquor permit premises, both of those sentences to run concurrent with the sentences for felonious assault. Barringer timely filed his notice of appeal to this court from the judgment entry imposing the sentences recited above.
 {¶ 4} Barringer asserts six assignments of error. These assignments of error shall be dealt with out of order. We shall first deal with the fifth assignment of error:
 {¶ 5} "The jury erred to the prejudice of the defendant-appellant when it convicted him of two counts of felonious assault, weapon under disability and weapon in a liquor establishment when the convictions are against the manifest weight of the evidence."
 {¶ 6} Barringer is arguing in this assignment of error that the jury "lost its way" in finding him guilty of two felonious assault charges, a weapon under disability charge, and possession of a firearm in a liquor permit premises.
 {¶ 7} "`The [appellate] court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'"[1]
 {¶ 8} Thus, the Supreme Court of Ohio has directed reviewing courts to reverse a conviction on the ground of manifest weight of the evidence only where there is a "manifest miscarriage of justice" and where the jury "clearly lost its way." Also, the weight to be given to the evidence and the credibility of witnesses are primarily matters for the jury to decide.[2]
 {¶ 9} The shooting incident happened in the early morning hours of January 25, 2004. During the previous evening, members of the Sanders family, extended family, and friends gathered at the Men's Civic Club in Ravenna, Ohio, to celebrate the birthday of Karen Sanders. At least seventy-three people were in attendance at the party. Prior to gaining entrance to the party, people had to undergo a security check to check for weapons. This was accomplished by one of the two security officers, Johnny Mack and Louis King, who were there to provide security for the party and who passed a wand over persons as they entered the premises.
 {¶ 10} After the party was in progress, Barringer, also known as Pepper, and his cousin, LeShaun Sanders ("Sanders"), also known as Peeper, arrived at the party. Knowing that weapons were not permitted in the club itself, they left their respective weapons under the passenger seat of the car they arrived in before they entered the club. At that time, Sanders had a .45-caliber handgun in his possession, and Barringer had a nine-millimeter handgun.
 {¶ 11} Sometime after Sanders and Barringer entered the club, they then went outside, rode around the block, and came back to the party. While they were sitting in the parking lot, they were advised that a fight was in progress between two females, Mary Kelly and Marquita Sanders. Sanders then went back into the club to see if he could break up the fight, but was pushed back toward the entrance by the security personnel who were trying to bring the crowd under control. Sanders then went back to the car where his .45-caliber handgun was stored, retrieved it, entered the club premises, and shot one round into the ceiling. Within a few seconds, four, five, or six rounds were fired into the crowd by another shooter. At trial, Sanders identified the other shooter as Barringer.
 {¶ 12} The round fired by Sanders did not injure anyone, but the rounds fired by the other shooter injured Deborah Kelly, in her arm, Jonathan Caples, in his arm, Johnny Mack, in his right thumb, and Clemmie Perry, grazing his skull.
 {¶ 13} Sanders testified how he and Barringer became involved in the fight going on inside the club. After being told of a fight in progress by a friend, he retrieved his.45-caliber handgun and proceeded into the club. Soon thereafter, "[h]e seen somebody with a bar stool like they going to throw it, and I took out my gun and shot it in the air." He saw Barringer run past him and "[t]hen I heard shots go off. When I heard shots go off, I looked over and seen Barringer firing in the club." Sanders did not know how many shots were fired by Barringer. Sanders also testified that after the incident, he and Barringer ran to Ravenna High School, where they were picked up by Cara Young.
 {¶ 14} When first questioned by the police, Sanders denied knowing who fired the other shots. However, he later told the police that Barringer was the other shooter, which resulted in Sanders being able to plead to lesser charges, provided that he testified truthfully at trial.
 {¶ 15} Cara Young testified that, after she picked up Sanders and Barringer at Ravenna High School, she overheard them discussing a fight that they had just witnessed.
 {¶ 16} Another cousin, Patricia Carter, testified. She was also at the birthday party and gave a statement to the police that "[y]es, he [Barringer] shot about four to six times." At trial, she recalled giving that statement, though it also came out that she told the police at other times that she did not know who the other shooter was.
 {¶ 17} Sanders' sister, Vanessa Jackson, who was also a cousin of Barringer's, testified at trial. She affirmed that she gave a statement to the police that Barringer was the other shooter, though her testimony at trial was equivocal and she tried to back off that statement by saying that she did not remember if Barringer did any shooting.
 {¶ 18} Lynn Kelly, the club vice president, testified. He testified that Sanders fired his weapon in the air, "[a]nd next thing I know, [Barringer] just starts shooting. As he's running, he's shooting, not knowing who he's shooting at and don't care who he hits." Kelly said that Barringer fired at least four shots, and that four people were injured, though he later testified that he personally observed only three discharges from a Glock or a nine-millimeter handgun. Kelly admitted to being shown a photo array by Detective Francis and, at that time, he was unable to identify Barringer as the other shooter. At trial, he positively identified Barringer as the other shooter because, as he explained, he could see him in person.
 {¶ 19} The final witness who was able to identify Barringer as the other shooter was Louis King, one of the security people at the club that night. Though he was also unable to pick Barringer out of a photo array shown to him by the police, he did identify Barringer at trial as the other shooter: "[Barringer] had the pistol turned sideways, and every time he took a shot, he took a step toward the door. He was running and shooting. After he shot four, five times, he went back around [Sanders], went outside the door."
 {¶ 20} Terrence Ogletree testified concerning the nine-millimeter weapon used in the shooting. He was not at the club during the incident, because he was attending to a sick daughter in the hospital that night. In a three-way conversation some weeks after the incident, Barringer offered to sell the gun to Ogletree. In that conversation, Barringer admitted to Ogletree that he did that shooting inside the club that night, and gave as his reason that he was attacked by the club's owners, and that's why he did the shooting. Ogletree was interested in reacquiring the gun, because it had been stolen from him. He was able to reacquire it, without paying for it, through a third party. Because he was a convicted felon, Ogletree was reluctant to tell the police about the theft of the gun, but he did inform his attorney and the prosecutor's office concerning the gun. Eventually, Ogletree became a suspect in the Men's Civic Club shooting, he was arrested, and, at that time, he told the police the whereabouts of the gun. He said that he "felt that the situation needed to be corrected about who did the shooting, and I was willing to take that chance about [the possession of a weapon under disability charge]." At trial, Ogletree testified that he was not looking for any deals from the police for turning in the weapon, though supposedly the prosecutor had told defense counsel in a pretrial conversation that Ogletree was looking for a deal. Defense counsel made an issue of this discrepancy and moved the trial court for a mistrial on the basis of this discrepancy, but the motion was denied.
 {¶ 21} Thus, at trial, five people testified concerning the identity of Barringer as the other shooter. Two of the five people, who were his cousins, tried to back off their previous statements made before trial to the effect that he was the other shooter, but they affirmed that those statements had been made. Another two of the five people made a positive identification at trial that Barringer was the other shooter, all the while admitting that they made mistaken identifications of him in photo arrays that had been shown to them. Barringer's companion and fellow shooter that night, Sanders, positively identified Barringer as the other shooter. Sanders admitted to his own shooting activity that night and that he had made a deal with the prosecutor to plead to a lesser charge in return for a fixed prison term of one year.
 {¶ 22} On the periphery of the incident were Cara Young, who picked up Sanders and Barringer after the incident at Ravenna High School, and Terrence Ogletree. Cara Young testified that they discussed a fight they had just witnessed. Terrence Ogletree testified that Barringer admitted to him that he was the shooter, though he tried to justify it as having been provoked by the club's owners.
 {¶ 23} The jury was in the best position to weigh all the evidence, including the credibility of the witnesses respecting identification of Barringer as the other shooter. As the trier of fact, it was able to consider that two of the witnesses tried to back off their previous statements; it was able to consider that another two witnesses could not pick Barringer out of a photo array, but were able to positively identify him as the other shooter at trial; and it was able to consider that Sanders was given a deal for a fixed prison term in return for his testimony. It was able to consider all these factors, and still arrive at a guilty verdict by weighing the evidence as a whole. The jury's verdict is not inconsistent with the evidence as a whole. We cannot say that the jury clearly lost its way or created a manifest injustice by finding Barringer guilty of being the other shooter.
 {¶ 24} Barringer's fifth assignment of error is without merit.
 {¶ 25} Barringer's first assignment of error is as follows:
 {¶ 26} "The trial court erred to the prejudice of the defendant-appellant by allowing several witnesses to identify defendant, Mr. Barringer, as the shooter when those witnesses failed to identify Mr. Barringer in a photo array."
 {¶ 27} Barringer is arguing in this assignment of error that his due process rights were violated by the trial court when it allowed witnesses to identify him at trial where they were previously unable to pick him out of a photo array. He asserts that an in-court identification is "inherently suggestive" and "inherently unreliable." By his reckoning, the witnesses who misidentified him in a photo array should not have been permitted to testify as to his identity at trial.
 {¶ 28} However, the United States Supreme Court, in the case of Simmons v. United States, refused to prohibit the method of initial identification of suspects through the use of photographs, and allowed that the risk of misidentification could be reduced by means of cross-examination:
 {¶ 29} "Despite the hazards of initial identification by photograph, this procedure has been used widely and effectively in criminal law enforcement, from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs. The danger that use of the technique may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error. We are unwilling to prohibit its employment, either in the exercise of our supervisory power or, still less, as a matter of constitutional requirement. Instead, we hold that each case must be considered on its facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."[3]
 {¶ 30} Four years later, in a case dealing with the admissibility of testimony concerning the out-of-court identification process itself, that same court said that it is "the likelihood of misidentification which violates a defendant's right to due process * * *."[4] In determining the likelihood of misidentification, the court promulgated five factors to consider in connection with a totality of the circumstances analysis:
 {¶ 31} "[W]hether under the `totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive. As indicated by our cases, the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation."[5]
 {¶ 32} The Supreme Court of Ohio has applied the foregoing principles to conclude that "[t]he focus, under the `totality of the circumstances' approach, is upon the reliability of the identification, not the identification procedures."[6]
 {¶ 33} Barringer asks this court to abrogate the totality of the circumstances approach, and, instead, adopt an absolute rule that identification testimony of witnesses at trial is legally inadmissible where the witnesses were previously incorrect in their identification of the defendant. He contends that if the witness' memory was so bad at the time of the commission of the crime, then that same witness is inherently unreliable in subsequent testimony at trial. In his view, if a witness cannot correctly pick a suspect out of a photo array in the first place, then he should not be able to testify at trial as to the suspect's identity and connection with the crime. Barringer buttresses this argument by mentioning three times that he was the only African-American at the trial table, so, naturally, the witness is going to pick him out as the perpetrator of the crime.
 {¶ 34} In his argument, Barringer misses the point of the cases just cited, which do not stand for the proposition that the trial court must measure the accuracy of the witness' memory. Instead, the cases just cited stand for the proposition that the pretrial photographic identification procedure must not be so suggestive as to be unreliable. They are intended to guard against misidentification at the pretrial stage, which is reinforced by further misidentification testimony at trial. In this case, the two witnesses who misidentified the photographs at the pretrial stage did not stay with those misidentifications at trial. They did not identify Barringer in the photo arrays, but they did identify him at trial. There was nothing suggestive about the photo arrays in the record, nor does Barringer argue as much, that would disqualify the witnesses from testifying at trial. Defense counsel was permitted to cross-examine both of those witnesses in order to bring out the potential for error in the photographic identification process. The law in this area is governed by the totality of the circumstances approach. Barringer's proposition for a prohibition of trial testimony that is not absolutely consistent with pretrial identification is not approved by this court.
 {¶ 35} Barringer's first assignment of error is without merit.
 {¶ 36} Barringer's second and third assignments of error deal with the same subject matter and will be considered together. They are as follows:
 {¶ 37} "[2.] The trial court erred to the prejudice of defendant-appellant when it overruled his motion for a mistrial after there was significant confusion regarding the photo arrays shown to various witnesses.
 {¶ 38} "[3.] The trial court erred to the prejudice of the defendant-appellant when it failed to grant his motion for a new trial."
 {¶ 39} Defense counsel moved for a mistrial when he became confused as to which of the three separate photo arrays were shown to which witnesses. He had been operating under the assumption, and his trial strategy reflected as much, that one of the photo arrays shown to Lynn Kelly had a picture of Terrence Ogletree in it. His further assumption was that Lynn Kelly had picked Ogletree's picture from the photo array. Since Ogletree later admitted that he owned the gun involved in the shooting, defense counsel felt he had a good argument at trial to persuade the jury that Ogletree was the shooter, and not Barringer. He said as much in his opening statement to the jury. However, his trial strategy lost its punch when, during trial, it came out that the photo array with Ogletree's picture was never shown to any witness. Having come to the wrong conclusion as to which photo array was shown to Kelly, based on materials that he reviewed in the discovery packet handed him by the prosecutor, defense counsel moved for a mistrial on the basis that he was misled into drawing the wrong conclusions about the photo arrays, and that he had to change his trial strategy accordingly.
 {¶ 40} The trial court conducted an evidentiary hearing outside the presence of the jury. It made a record as to the preparation and assembly of the photo arrays by the Ravenna Police Department. It denied Barringer's motion for a mistrial. If the trial court committed error in this regard, Barringer would have to show that "substantial rights of the accused are adversely affected."[7] In addition, "only when the ends of justice so require and a fair trial is no longer possible" should a mistrial be declared.[8]
 {¶ 41} This court will not second-guess the decision of the trial court in deciding whether to grant or deny a motion for a mistrial, because that decision rests within the sound discretion of the trial court,[9] and the trial court is in the best position to determine whether a mistrial is called for.[10]
In this case, the trial court made an extensive record to delineate the first photo array without Barringer's picture, which photo array was not used, and the subsequent photo arrays with Barringer's picture, which were used. From the record it is clear that the photo arrays shown to the witnesses had Barringer's picture in them. It is also clear that none of the photo arrays shown to the witnesses had Ogletree's picture in them. Throughout the trial, the trial court allowed defense counsel to cross-examine witnesses with respect to all photo arrays, even the array with Ogletree's picture in it, which had not previously been shown to any witness.
 {¶ 42} Barringer's substantial rights, including his right to a fair trial, were not affected by defense counsel's need to change his trial strategy. He was still permitted to pursue the theory whereby someone else did the shooting, because he could still employ the facts that witnesses made a mistaken identification of the perpetrator in the photo arrays; that Ogletree came forward as the owner of the gun used in the shooting; and that the police had no written procedures for assembling photo arrays, relying instead on their training and experience. We do not believe the trial court committed error in refusing to grant a mistrial.
 {¶ 43} Following the jury verdict, Barringer filed a motion for a new trial. He again asserted the confusion engendered by the various photo arrays as a ground for a new trial. Specifically, he stated that he cross-examined Lynn Kelly at trial with a photo array that later turned out not to be the photo array that was shown to Kelly by the police. This "misinformation" was caused by the materials provided to him in discovery and furnished by the prosecutor. Thus, argues Barringer, such "misinformation" was an irregularity in the proceeding that could only be rectified by a new trial; it amounted to prosecutor misconduct; and it was a surprise that ordinary prudence could not have guarded against.
 {¶ 44} In addition, in his argument to this court, he noted the inconsistency of the jury verdict in that the testimony at trial indicated that four people were injured by the other shooter, and yet the jury returned guilty verdicts on only two of the four counts. Eo ipso, argues Barringer, the verdict is inconsistent, and if the jury didn't believe that Barringer shot Clemmie Perry and Rodney Mack, then "it was factually impossible" that he shot Deborah Kelly and Jonathan Caples.
 {¶ 45} Crim.R. 33 provides the procedure for filing a motion for a new trial, and it reads, in pertinent part:
 {¶ 46} "(A) Grounds. A new trial may be granted on motion of the defendant for any of the following causes affecting materially his substantial rights:
 {¶ 47} "(1) Irregularity in the proceedings, or in any order or ruling of the court, or abuse of discretion by the court, because of which the defendant was prevented from having a fair trial;
 {¶ 48} "(2) Misconduct of the jury, prosecuting attorney, or the witnesses for the state;
 {¶ 49} "(3) Accident or surprise which ordinary prudence could not have guarded against; * * *
 {¶ 50} "(5) Error of law occurring at the trial[.]"
 {¶ 51} A motion for a new trial pursuant to Crim.R. 33 "is addressed to the sound discretion of the trial court, and will not be disturbed on appeal absent an abuse of discretion."[11] An abuse of discretion is "more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable."[12]
 {¶ 52} As previously discussed above, the trial court made an extensive record following Barringer's motion for a mistrial on the subject of the preparation and assembly of the photo arrays by the police. The confusion, if any, regarding the photo arrays appears to have been caused by defense counsel's review of the discovery materials and his misreading of them. The record made by the trial court adequately addresses whether there was any irregularity in the proceedings caused by this procedure. Its conclusion was in the negative, and we see nothing in the record to disagree with that conclusion. Nor do we believe that any actions of the prosecutor constituted prosecutor misconduct. In fact, defense counsel made a point of saying to the trial court that, "I do not accuse my colleagues of anything inappropriate whatsoever. I mean they have been fully forthcoming throughout all of the case." That defense counsel was surprised by the way the different photo arrays were handled was not anything caused by the actions of the prosecutor, but rather by his own review of the discovery materials. There was no error of law committed by the trial court and there was no abuse of discretion in failing to grant Barringer's motion for a new trial.
 {¶ 53} With respect to the inconsistency in the verdict as a ground for a new trial, "[i]nconsistent verdicts do not provide a basis for new trial. In fact, the Ohio Supreme Court has long held that inconsistent verdicts on different counts in a multi-count indictment provide no basis for retrial."[13]
 {¶ 54} Our review of the record indicates that Barringer has not demonstrated sufficient grounds to warrant the granting of a new trial, and we sustain the trial court's denial of his motion for a new trial.
 {¶ 55} Barringer's second and third assignments of error are without merit.
 {¶ 56} Barringer's fourth assignment of error is as follows:
 {¶ 57} "The trial court erred to the prejudice of the defendant-appellant when it failed to grant a motion for acquittal made pursuant to Rule 29 of the Ohio Rules of Criminal Procedure."
 {¶ 58} Barringer moved for acquittal pursuant to Crim.R. 29 at the conclusion of the state's case, but he failed to renew his motion at the conclusion of all the evidence.
 {¶ 59} The general rule among appellate districts has been that an appellant "who fails to properly move for a judgment of acquittal waives, absent plain error, the right to challenge on appeal the sufficiency of the evidence."[14] Further, this court has held that "[i]n order to preserve a sufficiency of the evidence challenge upon appeal, a defendant must renew his Crim.R. 29 motion at the close of his own case."[15] In such a circumstance, a plain error analysis is called for.[16]
 {¶ 60} However, on two occasions, the Supreme Court of Ohio has stated that a failure to timely assert a Crim.R. 29(A) motion does not waive an argument on appeal concerning the sufficiency of the evidence.[17] In both instances, that court has said that "[appellant's] not guilty plea preserved his right to object to the alleged insufficiency of the evidence[.]"[18]
 {¶ 61} Finally, the Fourth Appellate District has observed that "a conviction based upon insufficient evidence would almost always amount to plain error."[19]
 {¶ 62} Thus, for purposes of this review, we do not consider Barringer to have waived his right to argue sufficiency of the evidence on appeal.
 {¶ 63} Barringer was charged with four counts of felonious assault, having a weapon under a disability, and illegal possession of a firearm in a liquor permit premises.
 {¶ 64} R.C. 2903.11 provides that no person shall knowingly "cause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."[20]
 {¶ 65} Physical harm is defined as "any injury, illness, or other physiological impairment, regardless of its gravity or duration."[21]
 {¶ 66} R.C. 2923.13 provides that unless a person is relieved from disability pursuant to R.C. 2923.14, "no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance if * * * [t]he person is under indictment for or has been convicted of any offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse[.]"[22] Firearm is defined as "any deadly weapon [instrument, device, or thing capable of inflicting death] capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant."[23]
 {¶ 67} In order to find Barringer guilty of felonious assault and having a weapon under a disability, the court had to find that the state had proven, beyond a reasonable doubt, that Barringer acted knowingly. R.C. 2901.22(B) provides:
 {¶ 68} "[A] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."
 {¶ 69} Illegal possession of a firearm in a liquor permit premises is governed by R.C. 2923.121, which provides that "[n]o person shall possess a firearm in any room in which liquor is being dispensed in premises for which a D permit has been issued under [R.C. 4303]." In addition, the trial court was required to find that Barringer acted recklessly:
 {¶ 70} "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist."[24]
 {¶ 71} Under this assignment of error, Barringer again argues the inadequacy of his identification by eyewitnesses: "[o]nce again, the entire case rested on the identity of the second shooter." He further argues the confusion engendered by the photo arrays, which has been discussed at length above, and that "[t]he state failed to prove beyond a reasonable doubt that Mr. Barringer was the second shooter."
 {¶ 72} We have previously reviewed the testimony of various eyewitnesses, including Sanders, Lynn Kelly, Louis King, Patricia Carter, and Vanessa Jackson, all of whom identified Barringer as the shooter, either in pretrial statements or in direct testimony at trial. In addition, we have reviewed the testimony of Terrence Ogletree, who testified that Barringer admitted to him that he was the other shooter; and Cara Young, who testified that she picked up Sanders and Barringer at Ravenna High School after a "fight." Other witnesses' testimony that bears on the sufficiency of the evidence would include Deborah Kelly, who testified that she was shot in her right arm; Jonathan Caples, who testified that he was shot in his right arm; Buddy Martin, who testified that he drove Sanders and Barringer to the Men's Civic Club on the night in question; and Michael Roberts, a BCI technician, who testified that the gun used by the other shooter was operable. Finally, documentary evidence to support the fact that Barringer had a prior conviction and was, therefore, under a disability to carry a weapon was admitted into evidence, as was a class D liquor permit to support the fact that the Men's Civic Club was a liquor permit premises.
 {¶ 73} An argument that the evidence was insufficient challenges the evidence adduced by the prosecution to prove each element of the charged offense such that the matter should not be submitted to the jury.[25] In State v. Schlee, this court adopted the following test bearing on a sufficiency of evidence argument, "`"whether after viewing the probative evidence and the inference drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all of the elements of the offense beyond a reasonable doubt."'"[26]
 {¶ 74} Whether we view the evidence adduced by the prosecution, in the light most favorable to it, either under a plain error analysis or a sufficiency of the evidence analysis, we are compelled to the same conclusion. That conclusion is that the evidence adduced by the prosecution satisfied each and every element of the offenses charged against Barrringer; that the trial court properly submitted the matter to the jury; and that the jury properly determined that all the elements were present beyond a reasonable doubt.
 {¶ 75} Barringer's fourth assignment of error is without merit.
 {¶ 76} Barringer's sixth assignment of error is as follows:
 {¶ 77} "The trial court erred to the prejudice of the defendant-appellant when it sentenced defendant-appellant to a definite sentence of seven (7) years for felonious assault, to be served consecutively with a seven (7) year definite sentence for felonious assault, and a three (3) year sentence for the gun specification to be served consecutively, and failed to review all of the statutory factors announced in R.C. 2929.12."
 {¶ 78} In its sentencing order, the trial court stated:
 {¶ 79} "The Court has considered the record, oral statements, any victim impact statement and presentence report prepared, as well as the principles and purposes of sentencing under Ohio Revised Code Section 2929.11, and has balanced the seriousness and recidivism factors under Ohio Revised Code Section 2929.12." In addition, the trial court found that "prison is consistent with the purpose of Revised Code Section 2929.11 and the Defendant is not amenable to community control sanction." It found that it would demean the seriousness of the offense to impose the minimum sentence. It also found that consecutive terms were necessary: "[t]he Court finds that consecutive terms are necessary to protect the public and adequately punish the offender and because the harm was so great that a single term does not adequately reflect the seriousness of the conduct." This finding by the trial court was made pursuant to R.C.2929.14(E)(4).
 {¶ 80} The court then sentenced Barringer to a mandatory term of three years for the gun specification, seven years for each of the two felonious assault convictions, each to run consecutive to each other and to the gun specification term. In addition, he was sentenced to eleven months for the weapon under disability conviction and eleven months for the possession of a firearm in a liquor permit premises conviction, these sentences to run concurrent with each other and with the previous sentence.
 {¶ 81} The recent case of State v. Foster held that R.C.2929.14(E)(4) is unconstitutional, and that appellants who currently are on direct appeal must have their cases returned to the trial court for resentencing where consecutive sentences have been imposed pursuant to that statute.[27]
 {¶ 82} In addition, the court in Foster held that "[b]ecause R.C. 2929.14(B) and (C) and 2929.19(B)(2) require judicial factfinding before imposition of a sentence greater than the maximum term authorized by a jury verdict or admission of the defendant, they are unconstitutional."[28] The trial court made some, but not all, judicial findings pursuant to those statutes in order to impose "more than the minimum" sentences. In his brief, part of Barringer's argument was that he "struggle[d] to determine exactly why the court sentenced Defendant-Appellant to over seventeen (17) years of prison time[.]"
 {¶ 83} Therefore, we construe this assignment of error to challenge not only the imposition of consecutive sentences, but also the imposition of "more than the minimum" sentences. On resentencing, the trial court shall reconsider the imposition of both consecutive sentences and "more than the minimum" sentences with respect to Counts 1 and 2 of the indictment.
 {¶ 84} The sentences for the offenses of having a weapon under disability and possession of a firearm in a liquor permit premises, both of which were concurrent sentences, have not been challenged on appeal and shall remain undisturbed. In State v.Saxon, the Supreme Court of Ohio held:
 {¶ 85} "An appellate court may only modify, remand, or vacate a sentence for an offense that is appealed by the defendant and may not modify, remand, or vacate the entire multiple-offense sentence based upon an appealed error in the sentence for a single offense."[29]
 {¶ 86} Furthermore, R.C. 2929.14(E)(1)(a) provides that the mandatory sentence for the gun specification shall be served consecutively to any other charges. This statute was not affected by the Foster decision. Thus, the fact that the gun specification sentence was imposed as a consecutive sentence will not be affected upon resentencing.
 {¶ 87} The sixth assignment of error has merit.
 {¶ 88} The judgment of the trial court pertaining to Barringer's convictions is affirmed. However, that part of the sentencing order imposing consecutive sentences and "more than the minimum" sentences for the felonious assault convictions is reversed. The consecutive sentence for the gun specification shall remain undisturbed. This matter is remanded to the trial court for resentencing consistent with this opinion.
Cynthia Westcott Rice, J., concurs, Diane V. Grendell, J., concurs in judgment only.
[1] State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175.
[2] State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
[3] Simmons v. United States (1968), 390 U.S. 377, 384. See, also, State v. Butler (1994), 97 Ohio App.3d 322, 325.
[4] Neil v. Biggers (1972), 409 U.S. 188, 198.
[5] Id. at 199-200.
[6] (Emphasis in original.) State v. Jells (1990),53 Ohio St.3d 22, 27.
[7] State v. Nichols (1993), 85 Ohio App.3d 65, 69.
[8] State v. Franklin (1991), 62 Ohio St.3d 118, 127.
[9] State v. Sage (1987), 31 Ohio St.3d 173, 182.
[10] State v. Glover (1988), 35 Ohio St.3d 18, 19.
[11] State v. Schiebel (1990), 55 Ohio St.3d 71, paragraph one of the syllabus.
[12] State v. Adams (1980), 62 Ohio St.2d 151, 157.
[13] (Citations omitted.) State v. Newlin (Nov. 21, 1995), 10th Dist. No. 95APA03-379, 1995 Ohio App. LEXIS 5131, at *10.
[14] State v. Shadoan, 4th Dist. No. 03CA764, 2004-Ohio-1756, at ¶ 16.
[15] State v. Murray, 11th Dist. No. 2003-L-045,2005-Ohio-1693, at ¶ 42. See, also, State v. Stewart, 11th Dist. No. 2001-P-0035, 2002-Ohio-7270, at ¶ 72.
[16] State v. Shadoan, supra, at ¶ 16.
[17] State v. Jones (2001), 91 Ohio St.3d 335, 346 and Statev. Carter (1992), 64 Ohio St.3d 218, 223.
[18] State v. Jones, supra, at 346 and State v. Carter,
supra, at 223.
[19] State v. Shadoan, supra, at ¶ 16.
[20] R.C. 2903.11(A)(2).
[21] R.C. 2901.01(A)(3).
[22] R.C. 2923.13(A)(3).
[23] R.C. 2923.11(A), (B)(1).
[24] R.C. 2901.22(C).
[25] State v. Schlee (Dec. 23, 1994), 11th Dist. No. 93-L-082, 1994 Ohio App. LEXIS 5862, at *13.
[26] (Citations omitted.) Id.
[27] State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856, at ¶99-104 and paragraphs three and four of syllabus, citing Blakelyv. Washington (2004), 542 U.S. 296 and United States v. Booker
(2005), 543 U.S. 220.
[28] Id., at paragraph one of the syllabus.
[29] State v. Saxon, ___ Ohio St.3d ___, 2006-Ohio-1245, paragraph three of the syllabus.