[Cite as *State v. Henderson*, 2014-Ohio-3829.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-130541 |
| | | TRIAL NO. B-1201761-A |
| Plaintiff-Appellee, | : | |
| | | |
| vs. | : | *O P I N I O N.* |
| | | |
| DAVID HENDERSON, | : | |
| | | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal:  September 5, 2014

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Rachel Lipman Curran*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Michaela Stagnaro*, for Defendant-Appellant.

Please note:  this case has been removed from the accelerated calendar.

**FISCHER, Judge.**

{¶1} Defendant-appellant David Henderson was indicted for the attempted murders and felonious assaults of Brian Hunter and Branetta Carter. The charges were accompanied by firearm specifications. Following a bench trial, the trial court found Henderson guilty of the felonious assault of Branetta Carter under R.C. 2903.11(A)(1), along with the accompanying firearm specifications. It acquitted Henderson of the remaining charges.

{¶2} At sentencing, the trial court merged the firearm specifications. It sentenced Henderson to five years in prison for the felonious assault and to three years on the merged firearm specifications. The trial court ordered the terms be served consecutively, for a total sentence of eight years in prison.

{¶3} In this appeal, Henderson argues that his conviction for the felonious assault of Branetta Carter is not supported by the sufficiency or the weight of the evidence, and is legally inconsistent with the trial court's verdict of acquittal on the remaining counts. Finding no merit in his arguments, we affirm the trial court's judgment.

### The State's Case at Trial: A Shoot Out at the A to Z Market

{¶4} Kara Hayes testified that she drove to the A to Z Market on Reading Road. Her boyfriend, Alonzo White, and his brother, Deron Ferguson, got out of the car and went into the store. Ferguson's girlfriend, Mariah, and Mariah's baby, stayed in the car with Hayes. Hayes saw two men arguing near some CDs. Mariah wanted to leave. She and Hayes did not feel safe because of the two men arguing. Hayes went into the store quickly to tell White that she wanted something.

{¶5} As soon as she got back into the car, Hayes heard gunfire. She ducked. A bullet hit her car near the trunk. When she looked back up, she saw a girl collapsed in

the doorway of the store, bleeding. Hayes tried to assist the girl, who was bleeding from her neck. Within five to ten minutes, an ambulance arrived. Hayes then spoke with the police.

{¶6} Hayes identified a photograph of David Henderson, whom she knew as "Four." She told police that she had known him for a couple of months. Hayes had seen Henderson arguing before the gunshots broke out. She had seen Henderson facing toward her car, and the direction of the girl who had been shot. Hayes testified that the person Henderson had been arguing with had his back toward her and the front of the store. Hayes admitted on cross-examination that she had not seen who had started shooting and that she did not know who had shot at her car or who had shot at the girl.

{¶7} Catherine Carter testified that she drove to the A to Z Market with her sister Branetta, her brother, Yaman, her son's father, Tristan, and her Uncle Joe. Catherine stopped at the store, and everyone got out of the car. Tristan went over to the "African man" selling CDs. Catherine then went into the store. Shortly thereafter, someone came into the store and told her that her sister had been shot.

{¶8} Catherine denied hearing gunshots. She testified that she saw her sister Branetta lying on the ground by the store, called 911, and applied pressure to Branetta's neck. According to Catherine, no one else helped her provide aid to her sister. Catherine further testified that she never saw any of the people involved in the shooting and she did not see anyone arguing before entering the store. When Catherine was later interviewed by police, she told them she knew Henderson as "Fo." Catherine testified that she knew Henderson from the neighborhood, but that she had not seen Henderson the day her sister Branetta had been shot.

{¶9} Branetta Carter testified that she went into the A to Z Market with her sister Catherine to get a drink. As she walked out of the store, she was shot in the neck.

3

She collapsed on the ground and passed out. She was transported to the hospital, where she remained for a month. She then spent another month at Drake, a rehabilitation center. She underwent two surgeries. At the time of trial, she could move her legs, but she could not walk, so she was using a wheelchair. Branetta testified that she had not heard any arguing outside the store before she had been shot. She also had not seen who had shot her.

{¶10} Catherine and Branetta Carter both testified that they had not heard from or seen their brother, Yaman, for days before the trial. The court issued a forthwith body attachment for Yaman and Tristan because they had been personally served, but they failed to appear at trial.

### The Police Investigation Leads to Henderson

{¶11} Officer Gregory Gehring testified that police had recovered six 40-caliber shell casings and four 9-millimeter shell casings in close proximity to one another at the scene of the shooting. After police determined that Henderson was involved in the shooting, they arrested him. Henderson was hiding at his sister's residence, and police had obtained her consent to search. Police recovered a 9-millimeter High Point firearm in the bedroom where Henderson was found. Police also recovered a 45-caliber handgun from Brian Hunter, Henderson's codefendant, at the time of Hunter's arrest. But police determined that the 45-caliber handgun had not been used in the shooting at the market.

{¶12} As Henderson was transported to the police department for an interview, Henderson told an officer that "on Friday 3/9/12, he saw a gun fight on Reading Road and while trying to run away, he got clipped in the face." Officer Gehring interviewed Henderson at the police station, but Henderson was not very forthcoming. Henderson eventually admitted that he was known as "Four." He also admitted that the

9-millimeter High Point firearm police had recovered in the bedroom at his sister's residence belonged to him, and that he had used the firearm during the shooting at the A to Z Market. Henderson told Gehring that someone else was shooting at him during the incident. When Gehring showed Henderson a mugshot of Brian Hunter, Henderson said, "B. That's the guy that tried to kill me. No doubt about it."

{¶13} Officer Gehring testified that no tests had been performed to determine if the 9-millimeter casings found at the scene matched Henderson's High Point 9-millimeter firearm because Henderson had admitted it was the firearm he had used at the A to Z Market. Officer Gehring further stated that the bullet fragment taken from Branetta Carter did not contain any identifiable markings and, thus, it could not be matched to the 9-millimeter firearm recovered from Henderson. He further testified that the DNA found on the 9-millimeter firearm was a mixture from which Henderson could not be excluded.

### Henderson's Interview with Police

{¶14} The state then played Henderson's interview with police. In his interview, Henderson initially told police that he "did nothing to nobody." He did not have a gun at the A to Z Market, and he was not shooting at anyone, but he could give police the name of the person who he saw fire a gun that day. He told police he was standing by the store when he saw a man, whom he identified as Brian Williams, arguing with another man by the "African stand." Their argument escalated and they started shooting at one another. Henderson told police that when the shooting started, everyone took off running. Henderson ran around to the side of the store and to his aunt's home.

{¶15} Henderson initially denied that he had a nickname, but he later admitted that he had been called "Four." Henderson eventually admitted that he had been

approached by Hunter's brother, TO, the previous day, and that TO had fired a weapon at him. The day of the incident, Henderson was concerned for his safety that he was carrying a gun. He was standing outside the A to Z Market when he was approached by Hunter and a group of people. Hunter said something to him about TO and then said, "Give me everything you got." Hunter then pulled out a gun and started firing at Henderson at point blank range.

{¶16} Henderson told police that he had to defend himself, so he pulled out "a little .25" and started shooting. When police asked Henderson if he still had the gun, he told them that he had thrown the gun in a river. When asked if he had been shooting a High Point instead, Henderson denied owning or shooting a High Point.

{¶17} Henderson told police that he knew that Hunter had shot Branetta because, after Hunter had finished shooting, he had seen Branetta fall, and Hunter had taken off running. Henderson further stated that this had all occurred before he had even gotten a shot off. Henderson then fired three to four rounds before he took off running to his aunt's home. When questioned about the High Point that police had found in the bedroom at his sister's home, Henderson admitted that the weapon belonged to him and that it would match the shell casings recovered by police at the scene.

### Henderson's Trial Testimony

{¶18} In his defense, Henderson testified that he had been standing at the "African stand" next to the A to Z Market. He was buying a CD, when Hunter walked up to him from behind the store and fired shots. Henderson had been robbed by Hunter's brother a day prior to this incident. Henderson testified that when Hunter had pulled out a gun and had started shooting at him, he had fired two to three shots because he had felt that his life was in jeopardy and because he could not retreat. He fired three to

four rounds. He further testified that he did not shoot Hunter or Branetta that day. Henderson testified that he had only fired his gun because he wanted Hunter to stop shooting at him. Henderson further testified that Branetta was not in the direction he had been firing the gun. According to Henderson, Branetta had been hit before he had even fired a shot. Henderson testified that when Hunter had finished shooting, he took off running. Henderson testified that someone else was shooting that day, but he did not want to disclose who it might have been.

{¶19} On cross-examination, Henderson eventually admitted that he had intended to shoot Hunter. He admitted that he had fired a gun that day. He also admitted that he had lied to the police during some of his interview. Henderson further acknowledged that he was testifying to whatever he wanted to say, not necessarily the truth. Although Henderson denied shooting Branetta, he admitted that the shots he had fired that day could have hit anyone. When asked if he had ever fired a gun, Henderson refused to answer any further questions. Eventually, he admitted that he had carried a gun to defend himself. He said that he had run away after the incident to his aunt's home.

{¶20} Henderson repeatedly stated that he was not going to implicate anyone else. But he said he had returned fire when he was shot at. And although he claimed that he was facing in the opposite direction, Henderson admitted he had told police that he had seen Branetta fall. He tried to change this statement during cross-examination to mean that he had seen a lot of people in the area and that they had moved when the shooting began.

### Trial Court's Verdict and Sentence

{¶21} At the conclusion of the trial, the trial court took the matter under advisement to review Henderson's statement and the trial transcripts. The trial court

7

acquitted Henderson of the attempted-murder counts, the felonious-assault count involving Hunter, and one of the felonious-assault counts involving Branetta. The trial court found Henderson guilty of the felonious-assault count under R.C. 2903.11(A)(1), involving Branetta, and the accompanying firearm specifications.

{¶22}   Prior to the imposition of sentence, Henderson argued that the trial court's guilty finding on the felonious-assault count relating to Branetta was inconsistent with the trial court's verdict acquitting him of the other counts pertaining to Branetta and Hunter. The trial court overruled Henderson's motion and sentenced him to eight years in prison.

### Sufficiency and Weight of the Evidence

{¶23} In his sole assignment of error, Henderson argues that his conviction for felonious assault was supported by insufficient evidence and was contrary to the manifest weight of the evidence. Henderson argues that because the trial court acquitted him of the attempted murder and felonious assault of Hunter and the attempted murder and felonious assault of Branetta, the trial court must have had reasonable doubt as to his guilt. Therefore, the trial court's verdict finding him guilty of the remaining count of felonious assault of Branetta is not supported by sufficient evidence. He alternatively argues that the trial court must have believed that he had acted in self-defense, because it acquitted him of the remaining charges, and therefore, the trial court lost its way in finding him guilty of felonious assault.

{¶24}   Henderson's argument, however, is flawed because it assumes that a trial court's verdicts on separate counts in an indictment must be consistent. The Ohio Supreme Court has held that a verdict will not be set aside merely because the findings necessary to support that conviction are inconsistent with the findings necessary to acquit the defendant of another charge. *See State v. Hicks*, 43 Ohio

8

St.3d 72, 78, 538 N.E.2d 1030 (1989); *State v. Smith*, 10th Dist. Franklin No. 13AP-194, 2014-Ohio-709, ¶ 23-24. Moreover, the Supreme Court has held that "[t]he several counts of an indictment containing more than one count are not interdependent and an inconsistency in a verdict does not arise out of inconsistent responses to different counts, but only arises out of inconsistent responses to the same count." *State v. Lovejoy*, 79 Ohio St.3d 440, 683 N.E.2d 1112 (1997), paragraph one of the syllabus.

{¶25} Ohio appellate courts, including this one, have applied this principle, regardless of whether the inconsistent verdict has been rendered by a trial judge or a jury. *See State v. Andrew*, 1st Dist. Hamilton No. C-110141, 2012-Ohio-1731, ¶ 4-6; *State v. Colopy*, 5th Dist. Knox No. 2011-CA-3, 2011-Ohio-6120, ¶ 44-49; *State v. Webb*, 10th Dist. Franklin No. 10AP-289, 2010-Ohio-6122, ¶ 56-59; *State v. Williams*, 8th Dist. Cuyahoga No. 87218, 2006-Ohio-5325, ¶ 20-21; *State v. Pies*, 1st Dist. Hamilton Nos. C-990241 and C-990242, 1999 Ohio App. LEXIS 6031 (Dec. 17, 1999); *State v. Collins*, 4th Dist. Athens No. 94CA1639, 1995 Ohio App. LEXIS 4409 (Sept. 22, 1995). Thus, we will not probe into the logic or reasoning of the trial judge or jury to determine whether the verdict of acquittal could have been the result of mistake, compromise, or lenity. *Pies* at *8; *State v. Trewartha*, 165 Ohio App.3d 91, 2005-Ohio-5697, 844 N.E.2d 1218, ¶ 16 (10th Dist.). Rather, we may only reverse a conviction if it is supported by insufficient evidence or is contrary to the manifest weight of the evidence. *Pies* at *8; *Trewartha* at ¶ 16.

{¶26} In reviewing a challenge to the sufficiency of the evidence, this court must determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Thompkins*, 78 Ohio St.3d

9

380, 386, 678 N.E.2d 541 (1997). In addressing a manifest-weight-of-the-evidence challenge, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id.* at 387.

{¶27} To convict Henderson of felonious assault under R.C. 2903.11(A)(1), the state had to prove that he had knowingly caused serious physical harm to Branetta. To prove that Henderson had acted knowingly, the state had to show that Henderson was aware that his conduct would probably cause a certain result or would probably be of a certain nature. *See* R.C. 2901.22(B).

{¶28} The state produced sufficient evidence to support Henderson's conviction for felonious assault. Hayes testified that seconds before the shooting started, she saw Henderson next to the African man's CD stand arguing with someone and that Henderson was facing towards the A to Z Market. In his statement to police, Henderson admitted that he was standing outside the A to Z Market next to the CD man, arguing with Hunter, when Hunter pulled out a weapon and began firing at him. He told police he had seen Branetta fall. The trial court could have found that Henderson had acted knowingly given that Hayes had testified that Henderson was facing the store when he pulled out his weapon, Henderson saw Branetta fall, and Henderson had admitted firing multiple shots that day outside the A to Z Market. Moreover, Henderson never disputed that Branetta had suffered serious physical harm. She spent months in the hospital and was in a wheelchair at the time of trial. Thus, the state produced sufficient evidence to sustain Henderson's conviction for felonious assault. *See State v. Jordan*, 8th Dist. Cuyahoga No. 73364,

1998 Ohio App. LEXIS 5571 (Nov. 25, 1998) (noting that "firing a gun in a person's direction is sufficient evidence of felonious assault"); *see also State v. Phillips*, 75 Ohio App.3d 785, 792, 600 N.E.2d 825 (2d Dist.1991) (defendant's "intent to cause physical harm to the five individuals could be inferred from his having shot a gun randomly in the direction of each individual"); *State v. Gregory*, 90 Ohio App.3d 124, 131, 628 N.E.2d 86 (11th Dist.1993) ("the shooting of a gun in a place where there is a risk of injury to one or more persons supports the inference that appellant acted knowingly" regardless of his purpose).

{¶29} Henderson also argues his conviction is against the manifest weight of the evidence. He claims that he was acting in self-defense when he fired shots that day outside the A to Z Market.

{¶30} Under Ohio law, "self-defense is an affirmative defense that legally excuses admitted criminal conduct." *State v. Edwards*, 1st Dist. Hamilton No. C-110773, 2013-Ohio-239, ¶ 5. To establish self-defense, Henderson had to prove the following three elements by a preponderance of the evidence (1) he was not at fault in creating the situation giving rise to the affray; (2) he had a bona fide belief that he was in imminent danger of death or great bodily harm, and his only means of escape from such danger was in the use of such force; and (3) he did not violate any duty to retreat or avoid the danger. *See State v. Robbins*, 58 Ohio St.2d 74, 79-80, 388 N.E.2d 755 (1979); R.C. 2901.05(A). The elements of self-defense are cumulative. *State v. Jackson*, 22 Ohio St.3d 281, 284, 490 N.E.2d 893 (1986). Thus, if Henderson "fail[ed] to prove any one of these elements by a preponderance of the evidence, he has failed to demonstrate that he acted in self-defense." *Id.*

{¶31} Henderson argues that because his testimony at trial was uncontroverted, the trial court lost its way in finding he had failed to prove the

defense by a preponderance of the evidence. But Henderson's trial testimony conflicted with portions of his statement to police. In his statement to police, Henderson had stated that he had not fired any shots at Hunter until after Hunter had stopped shooting, turned, and started running away. In rejecting Henderson's claim of self-defense, the trial court could have found that this portion of Henderson's statement to police was more credible than his trial testimony. *See State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964) (the trier of fact is free to believe all, part, or none of any witnesses' testimony); *see also State v. Lakes*, 120 Ohio App. 213, 217, 201 N.E.2d 809 (4th Dist.1964) ("It is the province of the [factfinder] to determine where the truth probably lies from conflicting statements, not only of different witnesses but by the same witness").

{¶32} Based upon Henderson's statement to police, the trial court could have found that Henderson had failed to meet the second and third elements of the test for self-defense. The trial court could have found that once Hunter had stopped firing his gun at Henderson, the threat of physical harm to Henderson had dissipated, and Henderson did not need to fire his weapon back at Hunter. Thus, Henderson had no basis for a "bona fide belief that he was in imminent danger of death or great bodily harm" and could "escape from such danger" only by using deadly force. *Robbins* at paragraph two of the syllabus.

{¶33} At that point, Henderson also could have retreated from Hunter had he chosen to do so. By his own testimony, Hunter had stopped firing his weapon, had turned, and had begun running away from Henderson. Thus, Hunter no longer posed a threat to Henderson. Henderson, himself, could have turned and run away. Instead, however, Henderson fired three to four rounds from his 9-millimeter weapon. Based upon our review of the evidence, we cannot say the trial

court lost its way in concluding that Henderson had failed to carry his burden to establish that he had acted in self-defense. *See* R.C. 2901.05(A); *Edwards*, 1st Dist. Hamilton No. C-110773, 2013-Ohio-239, at ¶ 5.

{¶34} Having concluded that the state presented sufficient evidence to sustain Henderson's conviction for felonious assault, and that his conviction was not against the manifest weight of the evidence, we overrule his sole assignment of error and affirm the judgment of the trial court.

Judgment affirmed.

**CUNNINGHAM, P.J,** and **HENDON, J.,** concur.

Please note:

The court has recorded its own entry this date.