[Cite as *State v. Kotomski*, 2016-Ohio-4731.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# ASHTABULA COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | CASE NO. 2015-A-0047 |
| TERESA KOTOMSKI, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Ashtabula County Court of Common Pleas, Case No. 2014 CR 00153.

Judgment: Affirmed.

*Mike DeWine,* Ohio Attorney General, State Office Tower, 30 East Broad Street, 16th Floor, Columbus, OH 43215, and *Paul L. Scarsella,* Special Assistant Prosecutor, Ohio Attorney General's Office, 150 E. Gay Street, 16th Floor, Columbus, OH 43215 (For Plaintiff-Appellee).

*Paul H. Hentemann,* 38052 Euclid Avenue, #103, Willoughby, OH 44094, and *Mary Jane Trapp,* Thrasher, Dinsmore & Dolan, L.P.A., 1400 West Sixth Street, Suite 400, Cleveland, OH 44113 (For Defendant-Appellant).

DIANE V. GRENDELL, J.

{¶1} Defendant-appellant, Teresa Kotomski, appeals her conviction for Murder, following a trial to the court in the Ashtabula County Court of Common Pleas. The issues to be determined by this court are whether a murder conviction is supported by the weight and sufficiency of the evidence when the defendant's husband is shown to have died from antifreeze ingestion in a timeframe when the parties had been fighting

and spent the day together, and whether reversal for an inconsistent verdict is warranted when the defendant is convicted of Murder based on poisoning the victim with antifreeze but is acquitted of Contaminating a Substance for Human Consumption. For the following reasons, we affirm the judgment of the court below.

{¶2} On March 26, 2014, the Ashtabula County Grand Jury issued an Indictment, charging Kotomski with one count of Murder, an unclassified felony, in violation of R.C. 2903.02(A); and one count of Contaminating a Substance for Human Consumption, a felony of the first degree, in violation of R.C. 2927.24(B)(1) and (E)(1).

{¶3} On March 25, 2015, the State filed a Motion for Similar Acts, asserting that, pursuant to allegations by Teresa's ex-husband, in 1980, Teresa had poisoned him and his dog. The court did not allow this evidence to be admitted at trial.

{¶4} A trial before the judge was held on July 27 and 28, 2015. The following pertinent testimony and evidence were presented.

{¶5} On August 13, 2009, around 9:20 a.m., 911 dispatcher Lonna Arcaro received a call, with no response from the caller. She dialed the caller back and spoke to Teresa Kotomski, who explained that she needed an ambulance to respond to her home on Hammond Corner in Pierpont, stating "it's my husband."

{¶6} Pierpoint Fire Department EMTs, Chad Carter and Norm Woodard, arrived at the residence, where other responders were treating Raymond Kotomski, and preparing to take him to the ambulance. Raymond was unresponsive and Woodard observed that he was "gasping for breath, and he had a lot of foam around his mouth." Carter spoke to Teresa, who was at the scene. Teresa stated that she and Raymond, her husband, "had been arguing," she left the residence, and Raymond "contacted her and said that he drank something sweet." She also stated that he was an alcoholic.

2

Carter observed that the inside of the home was very clean and he did not notice any beer bottles or other items Raymond might have ingested lying around, aside from some soda cans on the counter.

{¶7} Teresa rode in the ambulance to the hospital. According to Woodard, she was "distraught" and said that she and Raymond had been fighting "two days ago" about his drinking and she left. She expressed a belief that his present condition was from alcohol.

{¶8} Teresa also told Ed Giblin, a Pierpont Fire Department paramedic, that Raymond "drank something that was sweet" which "dried his mouth out" and told her "she would be sorry." Teresa told Giblin that Raymond "went out to the garage" and took something like kerosene or gasoline.

{¶9} Upon his arrival at the hospital, Raymond was evaluated by Dr. Marian Barnett-Rico. She was informed that he had a history of alcohol use, but tests showed no alcohol in his system. Raymond was quickly intubated to help with his breathing, and Teresa informed her that "he didn't want * * * any prolonged * * * mechanical ventilation." Dr. Barnett-Rico explained that they had to determine what was wrong before deciding whether he would be on a ventilator for an extended period of time. Teresa said that he had been threatening to kill himself but she did not think he would. Dr. Barnett-Rico decided to transfer Raymond to Hamot Medical Center, aware that he may have ingested antifreeze based on information she received from Teresa and the acidic levels of his blood.

{¶10} At Hamot, Dr. Elizabeth Gall noted that Raymond needed to be tested for a toxic ingestion. Teresa also informed her that he mentioned drinking "something sweet." This, combined with the physical presentation of Raymond, led her to believe

3

he may have ingested antifreeze.  The test for ethylene glycol (found in antifreeze) was positive.

{¶11}  According to Dr. Gall, Teresa indicated she had been arguing with Raymond, and that she had been with him on the 11th when he was fine.  Teresa stated that he had not mentioned being suicidal.

{¶12}  Dr. Gall described the effects of ingesting antifreeze.  From 30 minutes to 12 hours afterward, a person has neurological symptoms, acting intoxicated.  From 12 to 24 hours, the person may have breathing and heart rhythm issues.   From 24 hours to 72 hours a person will begin to have renal failure and acidosis.   When Raymond arrived, he was in the late stages.  She explained that the antifreeze could have been consumed approximately 24 to 48 hours before she saw Raymond.

{¶13}  Although Raymond was treated for ingestion of ethylene glycol, he did not regain consciousness and the neurologist believed his prognosis was "grim."   Life support was ceased on the third day after he was hospitalized and Raymond died on August 16.  Dr. Gall's death summary indicated that the principal diagnosis was acidosis and ethylene glycol toxicity.

{¶14}  Kim Flickinger, Raymond's daughter, went to see him when he was hospitalized, but explained that she was not involved in the decision to terminate life support, made by Teresa.  Teresa stated "you don't know what I went through for the last 4 years."  Flickinger requested to have the body turned over to her, which Teresa allowed on the conditions that she "had to have him cremated and that [Teresa] wanted to make sure [Kim] wouldn't be the beneficiary."

{¶15}  The following testimony and investigation established the events leading up to Raymond's illness and death:

**{¶16}** Special Agent Robert McBride of the FBI spoke with Teresa about the events in the days preceding Raymond's death. Teresa indicated that she had moved out of her home with Raymond and into an apartment on August 8, 2009. She was having arguments with Raymond regarding their grandchildren. According to Special Agent Lance Fragomeli of the FBI, Teresa indicated that Raymond favored one of the grandchildren, and that Raymond was generally angry and "at times was verbally and emotionally abusive."

**{¶17}** Laura McCoy described that she rented an apartment to Teresa, with a move-in date of August 1 set. Although Teresa paid August rent, McCoy "never saw any evidence that she ever moved into the apartment." On August 7, Teresa said there was a flea problem. The apartment was rented to another tenant on August 22.

**{¶18}** On August 8, pursuant to the testimony of Joanne Gurowski, Raymond's niece, he visited her home in Pennsylvania to collect firewood. On that date, Raymond, who she described as "a happy, jovial person," was acting normally, spent time with her, and joked around with family members. Daniel Gurowski, Joanne's husband, noted that Raymond had lunch with them, and acted normally. They spoke about a television show and watched TV together.

**{¶19}** According to Special Agent McBride, Teresa indicated that she, Raymond, and the grandchildren "took a day trip" on August 11, eating, getting ice cream, and feeding fish. This trip began at around 10 a.m. and concluded at 5 or 6 p.m. After arriving at their residence, the two discussed reconciling, argued, and she went to her apartment. She was to return to the home to see Raymond that evening, but after a subsequent argument over the telephone, she did not do so.

{¶20} According to Mark Kollar, a Special Agent Supervisor for the Ohio Bureau of Criminal Investigation, on August 11, there were short calls between Raymond and Teresa between 9 and 10:20 a.m. The next call did not take place until 6:42 p.m. on that date, consistent with Teresa's statement that they spent the day together. Raymond made several short calls to Teresa between that time and 8 p.m., when Teresa called him back and the calls were longer. Several calls took place between the two, continuing until after midnight. Kollar characterized these as a "substantial amount of calls."

{¶21} Phyllis Allen, Teresa's friend, had a phone conversation with Raymond before he became sick, with him being upset because Teresa left him. On August 11, she received a voicemail message, in which he apologized. She described him as sounding like he had been drinking, which she had known him to do. This voicemail message was presented as evidence. Subsequent testimony regarding cell phone records demonstrated that the call occurred at 10:17 p.m.

{¶22} Beginning at around 9:30 a.m. on the 12th, phone records indicated that Teresa made several calls to Raymond, ending with a 1:45 p.m. call and resuming at 9:24 p.m. Teresa also called several times on the morning of the 13th.

{¶23} Teresa told Agent McBride that she visited Raymond on the morning of the 12th, staying a few hours. According to Agent Fragomeli, Teresa went to the house to do some laundry. When she arrived he was ill, had labored breathing, complained of pain in his stomach, had thrown up, and was "moaning." She wanted him to seek medical assistance, but he refused. She indicated that he told her he drank something sweet, which she assumed was Dr. Pepper. She called various times that night but did not receive a response. Kollar noted that the records demonstrated Teresa's statement

6

that she was at the residence at 11 a.m. on the 12th to do laundry for a few hours was inconsistent, since there were phone calls between the two during that time.

**{¶24}** On the 13th, Teresa had her mother check on Raymond, who discovered him unresponsive, and Teresa called 911. McBride noted that Teresa made a comment about Raymond "potentially killing himself," but he did not have "the stomach for it."

**{¶25}** An investigation started after Raymond's death, with a search of his home conducted. Detective Sean Ward of the Ashtabula County Sheriff's Office took various photographs of the home. An opened jug of antifreeze was located in the garage. Although some used cans were tested for traces of antifreeze, the results were negative.

**{¶26}** Kollar testified that a wiretap was performed on Teresa's phones in 2012. Several excerpts of phone calls from the wiretaps were played before the court. In one conversation, she talks about the investigation and whether the State has proof. Teresa stated, "Well if they had it they would have gotten me before don't you think?" In a conversation with another individual, she explained that she has to "stand [her] guns," and notes "that's my story three years ago and that's my story now," referring to it as being "my truth," but denying responsibility for the murder.

**{¶27}** Detective George Cleveland of the Ashtabula County Sheriff's Office noted that, although a bittering agent is now generally added to antifreeze to prevent consumption, this was not required in Ohio in 2009. Tests confirmed that there was no bittering agent in the antifreeze found at the Kotomskis' home. No DNA or fingerprints of Raymond or anyone else were found on the bottle. His investigation showed no evidence to support a finding that Raymond committed suicide.

7

{¶28} Dr. Eric Vey, a forensic pathologist, performed an autopsy, finding the cause of death to be complications of ethylene glycol toxicity and the manner of death undetermined. He described a similar timeline of ethylene glycol poisoning as Dr. Gall, and agreed that the antifreeze could have been consumed one to three days before Raymond's hospitalization. Dr. Vey noted that 3.3 ounces of antifreeze can be lethal.

{¶29} Dr. Joseph Felo of the Cuyahoga County Medical Examiner's Office testified for the defense. He explained that, given Raymond's size, being around 250 pounds, it would take more ethylene glycol to poison him than a smaller individual. Dr. Felo agreed that it would be logical for a person to seek medical attention after exhibiting symptoms from a poisoning. Dr. Felo found that Raymond "likely did not ingest a large dose at one time, because people who do will have a short survival period between time of ingestion and time of death," with elevated levels of ethylene glycol. Dr. Felo agreed that the level of ethylene glycol found in Raymond's blood may have been lower if some of it had metabolized when the blood sample was taken.

{¶30} On July 30, 2015, the trial court found Teresa guilty of Murder as charged in the indictment and acquitted her of Contaminating a Substance for Human Consumption. This was memorialized in a Judgment Entry on that date.

{¶31} On the same date, Teresa was sentenced to an indefinite term of 15 years to life imprisonment. A Judgment Entry of Sentence was filed on August 4, 2015.

{¶32} Teresa timely appeals and raises the following assignments of error:

{¶33} "[1.] The trial court erred to the prejudice of the defendant-appellant in denying her Crim.R. 29(A) motion for acquittal because the state failed to present sufficient evidence to establish the element necessary to support a conviction of murder beyond a reasonable doubt in violation of R.C. 2903.02(A).

8

**{¶34}** "[2.] The trial court erred as a matter of law and fact to the prejudice of the defendant-appella[nt] in finding sufficient evidence to convict her of murder in violation of R.C. 2903.02(A) by means of antifreeze poisoning, while finding insufficient evidence to convict her of contaminating a substance for human consumption inasmuch as these findings are inherently inconsistent.

**{¶35}** "[3.] The trial court's verdict finding the defendant-appellant guilty of murder is against the manifest weight of the evidence."

**{¶36}** In her first assignment of error, Teresa argues that the court erred in denying her Crim.R. 29(A) motion for acquittal since there was insufficient evidence to support a Murder conviction.

**{¶37}** In reviewing the sufficiency of the evidence, an appellate court must "examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In essence, sufficiency is a test of adequacy." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

**{¶38}** To convict Teresa of Murder, the State had to prove, beyond a reasonable doubt, that she "purposely cause[d] the death of another." R.C. 2903.02(A).

**{¶39}** Teresa argues that there was insufficient evidence for a Murder conviction, given the lack of evidence that she caused Raymond to ingest antifreeze.

She asserts that the circumstantial evidence of phone calls between the two, her interactions with Raymond on the dates leading up to his death, and her statements regarding taking him off of the ventilator are insufficient to sustain a conviction.

{¶40} We find that the evidence was sufficient to maintain the conviction. There was evidence to support a conclusion that Teresa had access to Raymond and the home and had been having a conflict with him in the days leading up to his poisoning. The State's timeline of her interactions with him, including their time spent together on August 11, matches the timeframe in which he would have been poisoned, based on the symptoms he exhibited. He also showed signs of poisoning in the voicemail he left that evening at 10:17 p.m. Teresa's statement regarding Raymond's desire not to be supported by a ventilator is also noteworthy, as it was made before doctors had even discovered what may be causing his symptoms/unresponsiveness. This evidence shows reason and access to commit the murder.

{¶41} Teresa takes issue with the trial court's conclusion that she stated Raymond did not want to be on an artificial breathing device for a long period of time, arguing that it is contradicted by Dr. Gall's testimony that she was unaware of discussions regarding removal of Raymond from life support. It is unclear why Teresa cites this testimony. The trial court's finding is supported by the testimony of Dr. Barnett-Rico. She testified that when she intubated Raymond, Teresa indicated that he did not want prolonged mechanical ventilation, and Dr. Barnett-Rico explained that they were not yet aware at the time if Raymond's illness could be remedied. This discussion took place within a short time after Raymond's arrival at the emergency room. Dr. Barnett-Rico found Teresa's statement to be "unusual" and "a little out of the blue,"

10

given those circumstances. The court's conclusion on this issue, then, was supported by sufficient evidence.

**{¶42}** Given these facts, there was sufficient evidence to support Teresa's convictions. *See State v. McFeeture*, 2015-Ohio-1814, 36 N.E.3d 689, ¶ 45 (8th Dist.) (the victim's death from chronic intoxication of antifreeze, "coupled with testimony about the troubled relationship between [the victim and defendant]" and the "opportunity" for the defendant to contaminate a beverage the victim regularly consumed, provided sufficient evidence to support the conviction).

**{¶43}** The first assignment of error is without merit.

**{¶44}** In her second assignment of error, Teresa argues that the court erred by finding sufficient evidence to convict her of Murder through the use of antifreeze but not finding sufficient evidence to convict her of Contaminating a Substance for Human Consumption. Teresa contends that it was inherently inconsistent to find that she caused Raymond to ingest antifreeze but did not place it in something he would ingest.

**{¶45}** Pursuant to R.C. 2927.24(B)(1), Contaminating a Substance for Human Consumption is committed when a person "[k]nowingly mingle[s] a poison, hazardous chemical, * * * or other harmful substance with a food, drink, nonprescription drug, prescription drug, or pharmaceutical product, * * * if the person knows or has reason to know that the food, drink, nonprescription drug, prescription drug, pharmaceutical product, or water may be ingested or used by another person."

**{¶46}** As an initial matter, this court has held that "[i]nconsistent verdicts do not provide a basis for a new trial. In fact, the Ohio Supreme Court has long held that inconsistent verdicts on different counts in a multi-count indictment provide no basis for retrial." *State v. Barringer*, 11th Dist. Portage No. 2004-P-0083, 2006-Ohio-2649, ¶ 53;

11

*State v. Fernandez*, 11th Dist. Lake No. 2001-L-162, 2002-Ohio-7140, ¶ 61. "[I]nconsistency in a verdict does not arise out of inconsistent responses to different counts, but only arises out of inconsistent responses to the same count." *State v. Lovejoy*, 79 Ohio St.3d 440, 683 N.E.2d 1112 (1997), paragraph one of the syllabus; *State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, 889 N.E.2d 995, ¶ 81.

**{¶47}** Teresa argues that the foregoing case law is inapplicable when a case is tried to the bench, since the concerns raised in a jury trial do not apply, such as unanimity among juries. *U.S. v. Maybury*, 274 F.2d 899, 903 (2d Cir.1960).

**{¶48}** The decision in *Maybury* is not binding on this court and this argument has been rejected in Ohio, where the inconsistency principle outlined above has been applied in both jury trials and bench trials. *State v. Smith*, 8th Dist. Cuyahoga No. 81344, 2003-Ohio-3215, ¶ 31 (an inconsistent verdict in a bench trial was permitted to stand, as "it is not necessary to fashion a higher standard for judges" than juries); *State v. Henderson*, 1st Dist. Hamilton No. C-130541, 2014-Ohio-3829, ¶ 25.

**{¶49}** Regardless, the trial court's verdicts were not inconsistent. The court's judgment entry, providing reasoning for its decision, aids in this determination. The court stated in its judgment that the State did not show "what the defendant mingled a harmful substance with, that is, food, drink * * [or] drug." In other words, the State failed to prove in exactly what substance the antifreeze was placed. This prevented a conviction on this charge only, since the court did not find that the State failed to prove that Teresa poisoned Raymond with antifreeze by some method, just that it did not show which substance in particular was poisoned. Whether it was necessary to prove which substance was poisoned to obtain a conviction on this charge is irrelevant.

12

**{¶50}** Teresa also contends that an exception to the rule of inconsistent verdicts applies, that verdicts involving "interlocking charges" allow for reversal. *State v. Kelley*, 109 So.3d 316, 317-318 (Fla.App.2013). Again, however, given the elements of the crime and the court's explanation for its verdict, it did not need to find that the antifreeze was in any substance, or in a specific substance, in order to convict Teresa of Murder.

**{¶51}** The second assignment of error is without merit.

**{¶52}** In her third assignment of error, Teresa makes several arguments related to the facts of this matter in support of her contention that her conviction was against the manifest weight of the evidence.

**{¶53}** Manifest weight of the evidence "addresses the evidence's effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins*, 78 Ohio St.3d at 386-387, 678 N.E.2d 541. "In other words, a reviewing court asks whose evidence is more persuasive -- the state's or the defendant's?" *Id.* An appellate court considering whether a verdict is against the manifest weight of the evidence must consider all the evidence in the record, the reasonable inferences, the credibility of the witnesses, and whether, "in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶54}** Teresa points out various alleged flaws in the State's evidence. As an initial matter, it is important to emphasize that, while each individual piece of evidence alone may not prove Teresa's guilt, the combination of this evidence is what supports the Murder conviction. This applies to the argument that the timeline does not prove

13

that Teresa committed the murder but Raymond could have ingested the antifreeze after she left on the 11th. The timeline clearly shows that the antifreeze was ingested sometime on the evening of the 11th. The continued communication by Teresa and Raymond, the arguments between the two, and Teresa's inconsistent statements serve to bolster the finding that she was responsible for Raymond's poisoning. The fact that Teresa did not seek help on the 12th when she saw Raymond was very ill, and that she made an immediate and unusual request to prevent supportive breathing machines, while possibly explained by Teresa's arguments if viewed separately, again weigh against her when viewed in the context of the totality of the evidence.

{¶55} Teresa also argues that Raymond's potential suicide provides reasonable doubt, noting that the evidence presented does not contradict this possibility. Considering the evidence against suicide in its totality, this possibility does not render the conviction against the manifest weight of the evidence. While it may be speculation that a person would be unlikely to commit suicide by consuming antifreeze, it is clear that it causes a long and likely painful death. Further, Teresa made inconsistent statements about her belief that Raymond may have been suicidal, a contention which is not supported by anyone other than the defendant. This is also contradicted by testimony of relatives that Raymond had been acting normally just a few days prior to the poisoning, giving no indication that he was suicidal. This is further supported by the fact that several investigators reported no signs whatsoever that Raymond had committed suicide. It is unusual that there was no evidence that he voluntarily consumed antifreeze, such as his fingerprints or DNA on the open antifreeze bottle or cans with antifreeze remnants. It seems unlikely that Raymond would cover up his own suicide, while such is not the case for Teresa.

14

{¶56} For these reasons, Teresa's conviction is not against the manifest weight of the evidence. *See State v. Auerswald*, 9th Dist. Medina No. 11CA0053-M, 2013-Ohio-742, ¶ 46 (where there were inconsistencies in the defendant's statement, evidence that contradicted a finding of suicide, ongoing marital discord, and testimony that antifreeze found in the marital residence did not contain a bittering agent, a conviction for Murder was not against the weight of the evidence).

{¶57} The third assignment of error is without merit.

{¶58} For the foregoing reasons, the judgment of the Ashtabula County Court of Common Pleas, finding Teresa guilty of Murder, is affirmed. Costs to be taxed against appellant.


CYNTHIA WESTCOTT RICE, P.J.

COLLEEN MARY O'TOOLE, J.

concur.