[Cite as *State v. Harrington*, 2018-Ohio-2088.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

| STATE OF OHIO | C.A. No. 16CA010961 |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| JEANNE HARRINGTON | COURT OF COMMON PLEAS COUNTY OF LORAIN, OHIO |
| Appellant | CASE No. 14CR089848 |

DECISION AND JOURNAL ENTRY

Dated: May 29, 2018

CARR, Judge.

{¶1} Defendant-Appellant, Jeanne Harrington, appeals from her convictions in the Lorain County Court of Common Pleas. This Court affirms.

I.

{¶2} On the morning of August 16, 2011, Harrington placed a call to the Avon Lake Police Department to notify them that her husband had committed suicide. Upon arriving at the marital residence, officers found the victim lying on a couch with his head wrapped in plastic. They also found a purported suicide note that was typewritten, but signed in ink with the victim's name. The coroner ultimately determined that the victim died as a result of asphyxiation, but was unable to conclusively state whether his death was the result of a homicide or suicide. After a lengthy period of investigation, the police arrested Harrington in connection with the victim's demise.

{¶3}    A grand jury indicted Harrington for murder, felony murder, two counts of felonious assault, and tampering with evidence.  A jury trial ensued, at the conclusion of which the jury found Harrington guilty on all counts.  The trial court merged several of her offenses as allied offenses of similar import and sentenced her to a total of 16 years to life in prison.

{¶4}    Harrington now appeals from her convictions and raises two assignments of error for our review.  For ease of analysis, we reorder the assignments of error.

II.

**ASSIGNMENT OF ERROR II**

APPELLANT'S CONVICTIONS FOR TWO COUNTS OF MURDER, TWO COUNTS OF FELONIOUS ASSAULT, AND TAMPERING WITH EVIDENCE WERE NOT LEGALLY SUFFICIENT.

{¶5}    In her second assignment of error, Harrington argues that her convictions are based on insufficient evidence.  We disagree.

{¶6}    A review of the sufficiency of the State's evidence and the manifest weight of the evidence adduced at trial are separate and legally distinct determinations.  *State v. Gulley*, 9th Dist. Summit No. 19600, 2000 Ohio App. LEXIS 969, *3 (Mar. 15, 2000).  When reviewing the sufficiency of the evidence, this Court must review the evidence in a light most favorable to the prosecution to determine whether the evidence before the trial court was sufficient to sustain a conviction.  *State v. Jenks*, 61 Ohio St.3d 259, 279 (1991).

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.  The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id.* at paragraph two of the syllabus.

{¶7} A person commits murder when he or she "purposely cause[s] the death of another * * *." R.C. 2903.02(A). Meanwhile, a felony murder occurs when a person "cause[s] the death of another as a proximate result of [his or her] * * * committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *." R.C. 2903.02(B). Felonious assault is a second-degree felony offense of violence. R.C. 2901.01(A)(9)(a); R.C. 2903.11(D)(1)(a). Pertinent to this appeal, a person commits felonious assault by either (1) "[c]aus[ing] serious physical harm to another," R.C. 2903.11(A)(1), or (2) "[c]aus[ing] or attempt[ing] to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance." R.C. 2903.11(A)(2). Tampering with evidence occurs when a person, "knowing that an official proceeding or investigation * * * is * * * likely to be instituted, * * * [a]lter[s], destroy[s], conceal[s], or remove[s] any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation * * *." R.C. 2921.12(A)(1).

{¶8} Harrington does not challenge any particular element of her convictions. Instead, she argues that the State failed to prove its case beyond a reasonable doubt because the evidence, if believed, only showed that she and the victim "had a troubled relationship" and fought shortly before his death. She notes that no lay witnesses were able to implicate her on the night the victim died, her DNA was not found on the plastic wrap binding his head, and the coroner was unable to conclusively rule the victim's death a homicide. According to Harrington, there was insufficient evidence that she perpetrated any of the crimes with which she was charged. *See State v. Johnson*, 9th Dist. Lorain No. 13CA010496, 2015-Ohio-1689, ¶ 13 ("[I]dentity of the perpetrator is an essential element that must be proved beyond a reasonable doubt.").

**{¶9}** On the morning of August 16, 2011, Harrington called the police to report that she had found her husband's body in their home. Sergeant Francis Tibbitts soon arrived, and Harrington informed him that she was making arrangements for her eleven-year-old son, who was unaware of the situation and playing on an upstairs computer. She told the sergeant that she and her son had gone shopping that morning and, when they returned home, she found the victim with his head wrapped in plastic. Harrington indicated that their house was scheduled for a sheriff's sale the following day, and the victim was meant to be fixing a plumbing issue in the basement. She stated that she last saw him around 2:00 a.m. when they argued about money and the pending sheriff's sale. After listening to Harrington tell him more about the family's debts, Sergeant Tibbitts went to look for the victim.

**{¶10}** Sergeant Tibbitts testified that he initially walked upstairs because he assumed the victim's body would be in the master bedroom. He was unable to find the victim in any of the bedrooms, however, so he eventually returned to the first floor. By that time, other officers had arrived, and he and another officer had to ask Harrington where the body was. She then informed them that the victim was in the den on the first floor. There was testimony that the victim routinely stayed in the den rather than the master bedroom because he and Harrington, though still married, were essentially estranged.

**{¶11}** In the den, Sergeant Tibbitts found the victim lying on a couch in a "semi-fetal position" with his head "tightly wrapped in shrink-wrap." A spool of plastic wrap lay on the floor and, on a nearby coffee table, the police found a brochure about living wills and a note that looked "as if it had been just opened out of an envelope." With the exception of the signature, the note was typewritten and read:

> This is the only possible way I will be able to feed and provide for my family and
> keep a roof over their head.

Sincerely,

[The victim's signature]

[The victim's typewritten name]

The victim's name was signed in ink, and the note bore two creases where it had been tri-folded.

{¶12} After viewing the victim, Sergeant Tibbitts returned to the kitchen to ask Harrington more questions. Harrington told him that her argument with the victim had become "a little physical" and involved some pushing, shoving, and hair pulling. She indicated that, at that point, she had used a stun gun on the victim. According to Harrington, the fight eventually stopped and the victim begged her not to call the police because he did not want to be charged with domestic violence. Harrington then went to bed and next saw the victim when she found his body. Sergeant Tibbitts confirmed that his department had frequently responded to Harrington and the victim's residence for domestic disputes. The department also had responded to the residence before for suicide attempts, but the sergeant confirmed that those attempts only involved Harrington. With respect to Harrington's demeanor that morning, Sergeant Tibbitts described her as being "very calm[ and] matter-of-fact."

{¶13} Officer Kirk Seekins also responded to Harrington's residence and was present when the coroner interviewed her. Harrington told the coroner that there had been "a few physical incidents" between her and the victim, but claimed she had never fought back. Though she admitted that she had bought a stun gun, Officer Seekins testified that Harrington initially was less than forthcoming about the details surrounding its use. Only after the coroner informed her that there was proof the victim had been stunned numerous times did she state: "Well, I used it about twenty times. * * * I zapped him all over." Officer Seekins confirmed that the police found Harrington's hand-held stun gun in the living room and the box for the plastic wrap roll in

the dining room. He testified that, when the coroner asked Harrington whether she may have touched either the plastic wrap or the note they found on the coffee table, she confirmed both possibilities. As to the note, Harrington stated that she had picked it up and unfolded it.

{¶14} Officer Seekins testified that Harrington spoke to the coroner about the debt with which her family struggled. She informed the coroner that the victim "could not support her" and that was the reason they had argued. When asked if the victim's possible motive for suicide could have been financial, Harrington stated that she knew the victim had five life insurance policies worth approximately $375,000. She also said that, while the victim's children were his beneficiaries, she believed "she would be the executor of the finances * * *."

{¶15} Following their investigation at the marital residence that morning, the police brought Harrington back to the police station for an interview. Sergeant Victoria Rightnour participated in a portion of the interview because she knew Harrington from the domestic disturbance calls her department had handled. She testified that Harrington had some light bruising on the inside of her arms and a mark on her finger that she attributed to the victim having bitten her. Sergeant Rightnour described Harrington's behavior during the interview as "bizarre at times," noting that she appeared to be fixated on money and off-topic things that "were completely geared away from what we were talking about * * *." She also noted that Harrington was not very emotional when discussing the victim's death, but did become upset when she discussed their son or their financial situation.

{¶16} During her interview, Harrington once again described the altercation she had with the victim before going to bed. Sergeant Rightnour noted that, had the altercation occurred the way Harrington described it, she would have expected to see signs of disarray in the small area where it allegedly occurred. Yet, multiple officers noted that they did not see any signs of a

struggle at the house. There was testimony that the house was extremely cluttered with boxes and various items filling the rooms, floors, and hallways. Nevertheless, none of those appeared to have been knocked over. Moreover, Sergeant Rightnour stated that, had the victim wrapped his own head in plastic wrap and asphyxiated, she also would have expected to see "at least some physical sign" that he had struggled or convulsed. She likewise found the purported suicide note suspicious because she would have expected him to have handwritten the note. Sergeant Rightnour testified that she was aware of a specific suicide threat Harrington made in 2007 when she threatened to put a plastic bag over her head.

{¶17} Dr. Frank Miller, the Chief Deputy Coroner for Lorain County, conducted the victim's autopsy. Upon his initial examination, he observed that plastic wrap had been "tightly applied" to the victim's head without any spaces or air pockets. Bloody fluid had accumulated between the plastic wrap and the victim's face, and Dr. Miller noted that the victim had blood on his shirt. After removing the plastic wrap, the doctor found bruising to the victim's lips and a one-half inch laceration to his lower lip. He opined that the application of the plastic wrap itself would not have caused those injuries. Instead, he testified that those injuries were consistent with an impact, such as a punch, or the forceful compression of the lips into the teeth. He also testified that the lip laceration could have resulted in "quite a bit of blood." Notably, however, no blood or blood trails were found in the area around the victim or the remainder of the marital residence. The only blood detected was the blood discovered on the victim's shirt and in between the plastic wrap and his face.

{¶18} Apart from the injuries to the victim's mouth, Dr. Miller testified that the victim sustained multiple injuries in several other locations. An internal examination of the victim's head revealed small hemorrhages to both temples that were consistent with impact injuries. The

doctor indicated that the severity of each blow was difficult to discern based on the nature of soft tissue injuries. He did testify, however, that at least one of the blows could have resulted in a loss of consciousness. An internal examination of the victim's neck also revealed small hemorrhaging on the front right side. The doctor indicated that the hemorrhaging he saw there was likewise consistent with either impact or forcible compression.

{¶19} As to the victim's torso, the doctor observed at least twenty abrasions or burns that were consistent with stun gun usage. He indicated that the injuries were primarily concentrated on the left side of the torso and chest, but also appeared on other areas of the torso and the victim's arms. The victim's arms, wrists, knees, and legs also bore abrasion injuries that the doctor opined were inconsistent with stun gun usage. He stated that those injuries were basic skin abrasions that a person might incur if his skin scraped along or impacted a surface.

{¶20} As part of his examination, Dr. Miller performed toxicology testing. The results of the testing revealed that the victim had an elevated amount of Benadryl in his system at the time he died. The doctor testified that Benadryl has a sedative effect and is generally administered orally. He stated that the amount of Benadryl the victim had in his system would not have been enough to render him unconscious, but could have dulled his reactions. The doctor noted that Benadryl could be mixed with food and that the victim's stomach contained a partially digested meal.

{¶21} Dr. Miller ultimately concluded that the cause of the victim's death was "asphyxia by plastic wrap over [the] mouth and nose." He was unable to determine within a reasonable degree of medical certainty, however, whether the victim's death was the result of homicide or suicide. He explained that he listed the victim's manner of death as undetermined because the

autopsy alone did not allow him to reach a definitive conclusion. He noted, however, that the victim's death was

> highly unlikely to be suicidal. And taking everything together, it is likely to be homicidal. But in our opinion, of [the coroner] and I, it did not meet the criteria for us to conclusively say [the victim's death was] the result of the acts of another person.

Though he acknowledged the possibility that Benadryl could blunt a person's panic instinct, Dr. Miller expressed doubt that, if conscious and unrestrained, a person could "avoid clawing at [their] face" if subjected to air depravation as a result of plastic wrap blocking their airway.

{¶22} Two women who were acquainted with Harrington also testified for the State. The first acquaintance met Harrington through her church pastor when she and her family needed a place to stay. She testified that she and her family lived with Harrington for approximately one month in the summer of 2009. Though Harrington did not expect the woman and her family to pay rent, the first acquaintance testified that Harrington asked her to do two things: (1) pretend she was an old friend so that the victim did not question the arrangement, and (2) keep secret the fact that Harrington had a secretarial job at the church. The first acquaintance testified that Harrington only referred to the victim as "idiot brain," so she did not even know his actual name until she moved in and he introduced himself. She testified that Harrington and the victim slept in separate rooms and Harrington frequently expressed her dissatisfaction with him. While Harrington always said the victim "took all of her money from her," the first acquaintance noted that Harrington would constantly spend money at stores.

{¶23} According to the first acquaintance, Harrington did not want the victim around, but said she could not afford a divorce. Once Harrington learned the first acquaintance was trained as a pharmacy technician, Harrington frequently asked her about different drugs and the quantities necessary to kill the victim. On one particular occasion, she told the first acquaintance

a story about a woman who had murdered her significant other by sitting on his face and smothering him once he passed out from alcohol. Harrington informed the first acquaintance that the woman had only been caught because they found her DNA on the man's face. She then said, "'[w]hen I do that, I will put Saran Wrap between my rear end and his face, so my DNA isn't on his face." The first acquaintance testified that, after she learned about the victim's death, she suspected Harrington and knew she had to speak to the police.

{¶24} The second acquaintance also met Harrington in 2009 and knew her from the church. When speaking with the second acquaintance, Harrington likewise referred to the victim as "idiot brain" and frequently spoke of her family's money troubles. Harrington described how the victim made her sign over her house to him and forged her name on financial documents to borrow money and spend it on gambling. She also discussed killing the victim "with pills or things like that." The second acquaintance testified that Harrington once claimed to have a "sure way to do her husband in." According to the second acquaintance, Harrington said "she would incapacitate him, then take Saran Wrap and wrap it around his head and then she was going to sit on his face to make sure he was suffocated." The second acquaintance confirmed that Harrington discussed killing the victim multiple times in 2010.

{¶25} A servicing loan officer from the bank that held the victim's mortgage confirmed that his and Harrington's residence was scheduled for a sheriff's sale the day after the victim died. She indicated that the victim began falling behind on the mortgage payments in 2003. Though the bank instituted a foreclosure action in 2007, multiple bankruptcy filings had slowed the process. On the evening the victim died, the loan officer received a voicemail message from Harrington about the foreclosure. In the voicemail, Harrington asked to stop the foreclosure in light of the fact that the victim had committed suicide. She also stated that she understood the

bank's frustration with the victim because she had been dealing with the same frustration for the last ten years.

{¶26} As part of the investigation the police conducted, Lieutenant Vince Molnar collected Harrington and the victim's financial records and reviewed the victim's insurance policies. All of the checks that the victim had received from his job as a car salesman were direct deposited to an account that was solely in Harrington's name. Lieutenant Molnar documented the amounts that Harrington spent on "retail spending or restaurant spending and the like" and the overdraft fees she incurred in the months preceding the victim's death. He noted that Harrington: (1) had over $550 in miscellaneous expenses from January 27, 2011, to February 24, 2011, and $69 in overdraft fees; (2) had over $350 in miscellaneous expenses from February 25, 2011, to March 23, 2011, and $216 in overdraft and returned item fees; (3) had over $700 in miscellaneous expenses from March 24, 2011, to April 25, 2011, and $187.50 in overdraft fees; (4) had over $500 in miscellaneous expenses from April 26, 2011 to May 24, 2011, and $187.50 in overdraft fees; (5) had over $400 in miscellaneous expenses from May 25, 2011, to June 23, 2011, and $225 in overdraft fees; (6) had over $800 in miscellaneous expenses from June 24, 2011, to July 26, 2011, and $355 in overdraft fees; and (7) had about $150 in miscellaneous expenses from July 27, 2011, until the day the victim died (August 16, 2011) and $70 in overdraft fees. Once the victim died and Harrington began receiving more money from social security, her miscellaneous expenses likewise increased. For instance, from September 27, 2011, to October 26, 2011, she spent over $1,300 on miscellaneous expenses and incurred $315 in overdraft fees. Lieutenant Molnar testified that Harrington's pattern of incurring overdraft fees continued in 2012 and 2013 as well, despite the fact that the victim had died in 2011.

{¶27} Lieutenant Molnar testified that the victim had several life insurance policies, one of which was an extra ordinary life policy in the amount of $100,000. The victim originally owned that policy, but Harrington became its owner in 2007. Following that change, she borrowed against the policy on two occasions. She also changed its named beneficiaries after the victim died by making his son a contingent beneficiary and leaving her son from a former marriage as the sole beneficiary. Lieutenant Molnar testified that the policy eventually paid out proceeds in the amount of $56,567 and Harrington deposited that money into an account after her son signed over the check to her. She then issued her son a cashier's check for $5,000 and maintained control of the account. Lieutenant Molnar testified that Harrington received the money from the policy at the end of February 2013, but, by the end of June 2014, the account had just over $100 in it. As to two of the victim's other life insurance policies, he testified that Harrington ultimately filed a lawsuit because the insurance company would not distribute the proceeds. The proceeds were later distributed pursuant to a settlement, the conditions of which were that none of the proceeds be distributed to Harrington.

{¶28} As noted, the police found a purported suicide note lying on a coffee table near the victim's body. The note was swabbed for DNA and submitted to a handwriting expert for analysis, though the vast majority of it was typewritten. DNA testing revealed that an extremely rare profile, consistent with Harrington's profile, was found on the note in the area where it had been creased when tri-folded. Forensic scientists were unable to retrieve sufficient DNA from the swab of the signature on the note so as to make any comparisons.

{¶29} Officer Brian Hurd, who was trained in computer forensics, was asked to examine the five computers that the police found in the marital residence. He was unable to find any evidence of the purported suicide note having been created on one of the computers, but did find

several examples of letters or other correspondences that appeared to have been authored by either Harrington or the victim. In each letter or correspondence that appeared to have been authored by Harrington, she used left justification, closed her remarks with the word "[s]incerely," left a space for a signature, and included her typed name below the signature space. In the single document that appeared to have been authored by the victim, he typed in a single block paragraph that ended with "[s]incerely" and his name typed on the same line. No spaces were left between the text and the closing or between the word "[s]incerely" and his typed name. There was testimony that the victim was a car salesman for years and, in that role, routinely handwrote all of his orders. Meanwhile, there was testimony that Harrington frequently used a computer to prepare documents in her role as a church secretary. Consistent with the stylistic preferences she generally employed when authoring a document, the purported suicide note employed left justification, concluded with the word "[s]incerely," and included space for a physical signature below a typewritten signature.

{¶30} As to the signature that appeared on the purported suicide note, the State's handwriting expert was unable to offer a conclusive opinion as to whether it belonged to the victim or had been forged. She testified that she compared the signature to six other samples of the victim's signature. While there were pictorial similarities between the two, she noted at least one significant difference and several minor differences. She testified, however, that she could not reach a definitive conclusion based on only "one substantial significant difference." She explained that her review was hampered by the fact that the remainder of the note was typewritten, as she had to confine her review to such a small sample of writing (i.e., the signature itself).

**{¶31}** During Harrington's interview with the police, she told officers that she did not find unusual the fact that the victim would have typed his suicide note because his handwriting was "pretty bad." As noted, however, there was testimony that the victim routinely handwrote all of his orders as a car salesman. Additionally, the State introduced into evidence a sample of the victim's handwriting from 2007. The sample was a narrative that the victim completed as part of a police report, and Officer Seekins described the handwriting contained therein as "[v]ery legible."

**{¶32}** Apart from the foregoing evidence, the State also introduced several witnesses who presented testimony on the victim's general character, behaviors, and mood. All of those witnesses were aware that the victim had marital problems as well as financial problems, but none of them believed he was suicidal. Indeed, several of the witnesses were adamant that the victim had great love for his son and would not even consider divorce because he was afraid of losing his son.

**{¶33}** Viewing all of the evidence in a light most favorable to the State, a rational trier of fact could have concluded that the State proved its case against Harrington beyond a reasonable doubt. *See Jenks*, 61 Ohio St.3d 259 at paragraph two of the syllabus. Though Dr. Miller was unable to definitively conclude that the victim's death was a homicide, he specifically testified that it was "highly unlikely" the victim died as a result of suicide. *See State v. Tolliver*, 10th Dist. Franklin No. 02AP-811, 2004-Ohio-1603, ¶ 22, 87. *See also State v. Kotomski*, 11th Dist. Ashtabula No. 2015-A-0047, 2016-Ohio-4731, ¶ 28. He opined that the victim died as a result of asphyxiation from the plastic wrap and expressed doubt that an individual, if conscious and unrestrained, could commit suicide in that fashion without "clawing at [their] face." He noted that the victim had an elevated amount of Benadryl in his system, which may have had a

sedative effect, and that at least one of the injuries the victim sustained could have resulted in a loss of consciousness.

{¶34} Harrington admitted that she and the victim were involved in a physical altercation, but the only visible injuries she sustained were some minor bruises to her arms and a bite to her finger. Meanwhile, the victim suffered numerous injuries, including internal points of hemorrhaging, abrasions, a lip laceration, and more than 20 burn marks from a stun gun. Though Dr. Miller testified that the victim's lip had bled and that he found blood inside the plastic wrap and on the victim's shirt, no traces of blood were found on the victim's hands or in any area of the marital residence.

{¶35} There was testimony that Harrington often spoke of killing the victim. Indeed, on at least two occasions, she specifically discussed killing him by incapacitating him, covering his face in plastic wrap, and smothering him until he died. The State set forth evidence that she blamed the victim for their financial troubles, but had a habit of overspending that continued well after his death. Several of the individuals who testified noted her fixation on money, and there was testimony that she was familiar with the amount of insurance proceeds she and her family could expect to receive when the victim died.

{¶36} Although the police found a purported suicide note near the victim, the State's handwriting expert noted at least one significant difference and several minor differences between the signature on the note and other samples of the victim's signature. Moreover, there was testimony that the victim frequently handwrote documents while Harrington, a former secretary, routinely prepared typewritten correspondence in a fashion similar to that of the note. Accordingly, there was evidence from which the jury could have concluded that Harrington created the alleged suicide note and forged the victim's signature.

{¶37} In assessing the sufficiency of the evidence, "[c]ircumstantial and direct evidence inherently possess the same probative value." *Jenks* at paragraph one of the syllabus. The record reflects that the State produced a wealth of circumstantial evidence tending to show that Harrington perpetrated the crimes with which she was charged. *See Johnson*, 2015-Ohio-1689, at ¶ 13. This Court, therefore, rejects Harrington's argument that her convictions are based on insufficient evidence. Her second assignment of error is overruled.

## ASSIGNMENT OF ERROR I

APPELLANT'S CONVICTIONS FOR TWO COUNTS OF MURDER, TWO COUNTS OF FELONIOUS ASSAULT, AND TAMPERING WITH EVIDENCE WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF ARTICLE IV, SECTION 3, OF THE OHIO CONSTITUTION.

{¶38} In her first assignment of error, Harrington argues that her convictions are against the manifest weight of the evidence. We disagree.

{¶39} When considering whether a conviction is against the manifest weight of the evidence, this Court

must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the fact[-]finder's resolution of the conflicting testimony." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). An appellate court should exercise the power to reverse a judgment as against the manifest weight of the evidence only in exceptional cases in which the evidence weighs heavily against the conviction. *Otten* at 340.

{¶40} Harrington argues that the jury lost its way in convicting her because the evidence weighs heavily in favor of the conclusion that the victim committed suicide. She argues that the victim was mentally and physically exhausted from working long hours at two jobs, was facing significant financial pressures, including imminent foreclosure, and had a gambling problem he could not control. Harrington notes that she presented favorable expert testimony regarding the injuries the victim sustained, the likelihood that he could have taken his life using plastic wrap, and the signature that appeared on the purported suicide note. She also notes that at least one of the victim's co-workers recalled him talking about committing suicide by wrapping a bag around his head. According to Harrington, the jury lost its way by focusing on evidence related to her and the victim's marital troubles rather than the evidence that the victim was depressed and suicidal.

{¶41} Dr. Eric Vey testified for the defense as a forensic pathologist. In his opinion, all of the injuries the victim sustained before his death, such as the lip laceration, abrasions, stun gun burns, and internal bruises, were inconsequential. He indicated that the internal hemorrhages Dr. Miller found near the victim's temples were not indicative of injuries that would have resulted in a loss of consciousness. Meanwhile, he opined that the autopsy, standing alone, could not establish how much time elapsed between the victim's injuries and death or whether the stun gun injuries resulted in incapacitation. According to Dr. Vey, he recalled reading about a few cases where individuals had committed suicide by placing bags over their heads. Nevertheless, he admitted that such suicides were rare, that he had never personally seen one, and that, unlike plastic wrap, a bag would allow an individual to breath carbon dioxide rather than suffer complete air deprivation. He also could not definitively conclude that the

manner of the victim's death was suicide. He admitted that Dr. Miller's undetermined manner of death ruling was appropriate because both homicide and suicide were possibilities.

{¶42} A fireman from the Avon Lake Fire Department also testified for the defense regarding an experiment he performed in connection with the investigation. During the experiment, the fireman attempted to securely wrap his own head in plastic wrap to see whether it was possible to achieve the tight seal that had been found around the victim's head. The fireman testified that he ultimately succeeded in wrapping his own head and that the wrap was easily removed when he needed to breath. He admitted, however, that he had to attempt the experiment multiple times before he achieved a tight wrap and that he never allowed the wrap to remain in place long enough to experience any sort of oxygen deprivation.

{¶43} A forensic document examiner who testified for the defense examined samples of the victim's signature, compared them to the signature on the purported suicide note, and opined that the victim had signed the note. She admitted, however, that the first letter of the victim's last name, as signed on the note, contained an extra hump that did not appear on any of the victim's other signatures. Though the examiner acknowledged that there were multiple variations between the signature on the note and the known samples of the victim's signature, she ultimately attributed the variations to natural variations or accidental marks rather than forgery.

{¶44} Finally, a former co-worker of the victim's testified for the defense. The co-worker worked alongside the victim as a car salesman for approximately a year and described him as a "sleep deprived," "very down and miserable" man with both financial and marital problems. He indicated that he sometimes had concerns the victim might commit suicide and that the victim once said, if he did, he "'would just take cellophane, wrap it around [his] head or

a plastic bag and be done.'" Nevertheless, the co-worker clarified that the victim's comment occurred in the context of them discussing a "messy suicide" that someone else had committed. He also received assurances from the victim that he would never harm himself because of his son. The co-worker confirmed that "it was obvious that [the victim's son] was his world." Despite the difficulties the victim had, the co-worker agreed that he found him to be "an even-keeled person."

{¶45} When the victim's daughter from a prior marriage testified, she admitted that her parents' marriage had ended because the victim had a habit of gambling. She denied that her father was losing money gambling near the time of his death, however, because there was no money for it. The daughter testified that she would help her father cash the checks he received from his second, part-time job at a gas station, but he was paid very little. Meanwhile, the daughter testified that she knew Harrington had a habit of spending money on a great deal of unnecessary items.

{¶46} Another witness who frequently saw the victim at a cigar shop testified that the victim sometimes played poker with him and other men at the shop. He denied, however, that any of their games involved high stakes. Indeed, he did not recall anyone ever losing more than $20 when they played. He testified that he was familiar with Harrington because, on several occasions, she had come to the cigar store "yelling and dragging [the victim] out of there for whatever reason." He stated that the victim was never confrontational and that Harrington was clearly the one in charge.

{¶47} This Court has carefully reviewed the entire record in the matter and, having done so, cannot conclude that the jury lost its way in convicting Harrington. The State presented a wealth of circumstantial evidence tending to show that she engaged in an altercation with the

victim shortly before he died, that the circumstances surrounding his death were highly suspicious, and that she had a financial motive to murder him. Though Harrington presented some evidence in support of the conclusion that the victim committed suicide, the jury "had an opportunity to view the witnesses and 'was in the best position to assess the credibility of the evidence presented by the parties at trial.'" *State v. Senz*, 9th Dist. Medina No. 17CA0001-M, 2018-Ohio-628, ¶ 25, quoting *State v. Klingel*, 9th Dist. Lorain No. 15CA010876, 2017-Ohio-1183, ¶ 22. Harrington has not shown that this is the exceptional case where the evidence weighs heavily against her convictions. *See Otten*, 33 Ohio App.3d at 340. Consequently, we reject her manifest weight argument and overrule her first assignment of error.

III.

{¶48} Harrington's assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is

instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

 

 

DONNA J. CARR
FOR THE COURT

TEODOSIO, P. J.
CALLAHAN, J.
CONCUR.


APPEARANCES:

NICHOLAS J. HANEK, Attorney at Law, for Appellant.

DENNIS P. WILL, Prosecuting Attorney, and LINDSEY C. POPROCKI, Assistant Prosecuting Attorney, for Appellee.